JEREMY JACKSON,                                   CIVIL NO. 09-2946 (SRN/JSM)

     Petitioner,

v.                                                **REPORT AND RECOMMENDATION**

JESSICA SYMMES,

     Respondent.

JANIE S. MAYERON, United States Magistrate Judge.

This Matter is before the undersigned Magistrate Judge of the District Court on the petition of Jeremy Jackson for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Docket No. 1]. Respondent has filed an Answer, Memorandum ("Resp. Mem.") and Appendix ("Resp. Appx."), contending that the Petition should be dismissed [Docket Nos. 5, 6]. Petitioner filed a responsive brief ("Pet. Mem.") [Docket No. 8]. The case has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Petitioner's habeas corpus petition be DENIED and this action be DISMISSED WITH PREJUDICE.

## I.    BACKGROUND TO PETITION

The factual background of Petitioner's case, as described by the Minnesota Supreme Court, is as follows:[1]

> At approximately 10 p.m. on October 5, 2006, Jackson learned that Markey had been shot and was hospitalized. Upon receiving this news, Jackson and several friends drove to Markey's house, the place of the shooting, in a Ford

---

[1] "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Explorer. James Morris, one of the friends accompanying Jackson, testified that they planned to "see what was happening" at Markey's house before going to the hospital. Markey's house was located near the intersection of 37th Street and Portland Avenue in Minneapolis, an area known to be territory of the "Bloods" street gang.

At Markey's house, Jackson and Morris met with Frankie, Xzavier, and Dominique. The five men speculated about who might be responsible for shooting Markey, and focused on three Southside street gangs known as the "Bogus Boys," the "20s" and the "10s." After discussing Markey's shooting, the five men left Markey's house with a plan to go to the neighborhoods of the "Bogus Boys" and "20s" to "ride out," meaning "shoot" to "retaliate." They departed in the same Ford Explorer in which Jackson and Morris had arrived.

*28th Street and Nicollet Shooting*

Morris sat in the driver's seat of the vehicle, Jackson sat in the front passenger seat, Frankie sat in the second row of seats behind Jackson, Xzavier sat behind Morris, and Dominique sat alone in the third row of seats. The men first drove to Morris's cousin's house, where Morris and Frankie stored a gun that they owned jointly. From there, they drove to "Bogus Boys" territory, looking for gang members. Morris testified that they spotted one person in an alley who they tried to "catch," but lost him and continued driving. Morris testified that they were heading south on Nicollet Avenue toward 28th Street when they saw three or four people standing at a bus stop whom they believed to be Bogus Boys. According to Morris, he slowed the Explorer without stopping, and Jackson fired the gun through the opening of the passenger-side window toward the people at the bus stop. Morris then sped off, making a left turn onto 28th Street and away from the bus stop. Morris did not believe the shots had hit anyone.

In fact, one person, T.K., suffered serious injury that night at the 28th Street and Nicollet bus stop. T.K. testified that she stood at that bus stop at about 10:20 p.m. on October 5, 2006, waiting for a bus and talking with two teenage boys, both of whom she believed to be members of the "Crips" street gang. Although she admitted that she was "high off crack" that night, T.K. testified that she saw a large, silver vehicle slow down at the corner as a "light-skinned guy" with braided hair pointed a silver gun out of the front passenger window. She said that she heard one shot and jumped to

the ground, then realized she had been hit in the buttocks. The boys with whom she had been talking scattered. Seeking help, T.K. got up and walked about a block to find a police officer, who then called an ambulance. A different officer who was called to the scene of the shooting testified that he found two shell casings at the corner near the bus stop, indicating that a gun had been fired at that location.

At the time of the shooting, M.K. was waiting in her car at the red stoplight on 28th Street when she observed three shots fired from the front passenger window of an SUV at the 28th Street and Nicollet bus stop. She had a clear view of the passenger side of the SUV. M.K. dialed 911 immediately and told the dispatcher that she saw a black male wearing a white t-shirt who was hanging out of the front passenger window and holding a gun. M.K. told the dispatcher that she saw the man fire the gun toward the bus stop. M.K. drove her car forward and followed the SUV for several blocks while she spoke to the dispatcher, and the dispatcher immediately determined that the vehicle was a Ford Explorer. M.K. also described the shooter to the dispatcher as a male, about 30 years old and 215 pounds, with darker skin and short hair, not braids.

*Elliot Street Shooting*

Morris testified that, as he drove down 28th Street after the bus stop shooting, Frankie was directing the group, and they were going toward "20s" territory. Morris said that they pulled up to a corner where K.H. was stopped in her vehicle on the cross street. K.H. testified at trial that she saw the SUV at that location just before 10:30 p.m. and observed Jackson in the front passenger seat. Upon seeing Jackson, K.H. immediately called home to tell her mother to make sure that her brothers were not in front of the house. K.H. knew that her brother, D.H., and Jackson did not get along and, having seen Jackson so close to her home, she thought there was going to be a fight or shooting. K.H. testified that she received a return call from her mother two minutes later, telling her that someone had just been shot. K.H. returned home immediately and learned that Gennaro Knox, her 16-year-old neighbor, was dead at the scene.

Morris explained that when he saw K.H. in her car, he and the others were on their way to Elliot Street, at Frankie's direction. He testified that he knew D.H. and K.H. lived there, and that D.H. was a member of the "10s" gang. When the SUV turned onto Elliot Street, according to Morris, he

saw two teenage boys, whom Morris believed were "20s or 10s" based on their location and the fact that they were outside late at night. Morris testified that both boys saw them as they came up the block, and that both boys paused and looked frightened. Morris said that he stopped the vehicle in front of the boys and that Jackson fired more than three shots out of the front passenger window. Morris said that one of the boys ran between two houses, but the other ran straight back toward the gate in front of the house. Morris stated that the victim was shot as he tried to climb over the gate. He said that everyone in the car saw the victim fall to the ground as they slowly started to drive away, and that they then sped off. FN2

> FN2. The police did not recover the gun used in the October 5, 2006 shootings. But Morris testified that he hid the gun in his own car overnight and then returned it to his cousin's house where he had picked the gun up the night before. The police did find two .40-caliber discharged shell casings at the 28th Street and Nicollet bus stop and five of the same type of shell casings at the Elliot Street location. A forensic expert for the State testified that all of the casings were discharged from the same weapon.

D.W., who was on his way to a party with Knox when the shooting occurred, also testified. He explained that on the night of October 5, he and Knox had just stepped out of D.W.'s house on Elliot Avenue to get on their bicycles to ride to a party. D.W. said that he and Knox left the house through the front door, walked across the front yard, opened the gate of the fence and closed it behind them, and stepped down several stairs to the public sidewalk. D.W. testified that he got on his bike and started riding, but Knox paused for a moment to fix the "doo rag" on his head. As D.W. started out on his bike, he heard gunshots-between five and seven-behind him. D.W. looked back and saw Knox run back up the steps and begin to open the gate of the fence. At that point, D.W. lost sight of Knox because D.W. had darted between two houses. When he came out, D.W. saw his parents in front of his house and Knox lying on the ground, still breathing. According to D.W., neither he nor Knox were affiliated with any gang. But D.W. was aware of gang activity on his street, and his residence on Elliot Avenue was next door to the residence where D.H., a member of the "10s" gang, lived.

The medical examiner who was called to the scene testified at trial that Knox was hit twice, once through the neck and once through the armpit into the chest. The wounds, according to the examiner, were consistent with witnesses' description that Knox had been falling to the ground, or that his body was parallel to the ground, when he was shot. Officer Andrew Hanson testified that he received a dispatch call to the Elliot Avenue shooting at 10:31 p.m. When Hanson arrived at the scene, he found several people upset by the events, and Knox, who was not responsive. Paramedics arrived shortly thereafter and pronounced Knox dead.

According to Morris, after the shooting at Elliot Street, the men in the Ford Explorer went to a friend's house, and then later dropped off Xzavier at a location near 36th Street and Park Avenue. The four remaining men returned to Markey's house, at 37th Street and Portland Avenue, the location from which they had departed before the shootings. Friends were still gathered at the house. Several young women and another young man joined them, and the group used two vehicles-the Explorer and another-to drive around and do "stupid stuff" before heading to Hennepin County Medical Center (HCMC) to 'check up on Markey." HCMC video surveillance showed the group of friends entering the hospital at about 11:50 p.m. Referencing several video frames shown at trial, Morris pointed out Jackson wearing a white t-shirt and identified and described everyone else in the group. After checking on Markey, the group left the hospital and dispersed back to their homes.

Dominique and Xzavier, passengers in the Ford Explorer on the night of the shootings, also testified. Both largely corroborated the seating arrangement and sequence of events described by Morris. Both also testified that Jackson was the shooter. Dominique testified that he is a member in the "Tyson's Mob" street gang. Xzavier admitted that he is a member in the "Bloods" street gang. Xzavier further stated that the five men had gone out seeking revenge for Markey's injury.

The State also introduced evidence of finger prints taken from the Ford Explorer. Two of Jackson's finger prints were found on the passenger-side front door, one on the exterior handle, and one on the exterior surface of the rear window frame. Frankie's finger print was found on the passenger-side rear door, front window frame, exterior surface. These

findings are consistent with the seating arrangement in the Ford Explorer that the witnesses described.

*Evidence of Gang Affiliation*

At trial, witnesses testified that Jackson is a member of the "Bloods" street gang, also known as the "30s" or "Rolling 30s Bloods," and is known in his neighborhood as "Pooh" or "Gangster Pooh." Morris also identified Jackson as being in and out of "Bloods CBT," a subgroup of the Bloods. Morris testified that he is known as "PooPooh," and is a member of "Tyson's Mob," a gang closely affiliated with the Bloods. Morris explained that gang affiliation does not depend on colors as much as it depends on neighborhood. But he also said that Bloods identify with the color red and certain hand gestures. Morris identified the other men in the Ford Explorer on October 5, 2006, as belonging to either "Tyson's Mob" or the "Bloods."

According to Morris, members of the "Bloods" avoid using the letter "c" because of its affiliation with the "Crips." For example, a friend called "C.J." goes by "B.J.," and the phrase, "What's crackin'?" is repeated "What's brackin'?" The word "cuz" (short for cousin), Morris said, is changed to "smuz."

The State introduced evidence that Jackson used the gang language described by Morris in letters that Jackson wrote while in jail. For example, Jackson called someone "Fire Bracker" and the friend named C.J., "B.J." Jackson also wrote "smuz" in place of "cuz," and he used the term "brack head." He signed one letter "C.B.T." The State also introduced evidence that Jackson associated with a "Lady CBT" on a social networking web page, that he was arrested for disorderly conduct on December 29, 2005, when he was observed making hand gestures and wearing red, and that he was observed by police on July 21, 2006, with other known gang members.

In addition, the State's evidence showed that, on October 9, 2006, two days after his arrest but before he was charged, Jackson stated in a recorded phone call to his mother, "I better get out because if I don't, I know who told." When his mother asked who told, Jackson responded, "That bitch [K.H.] . . . . that shit happened right in front of her house. That bitch told."

*The Defense Case*

Jackson did not testify in his own defense or call any witnesses at trial.  But in his cross-examination of witnesses and in closing, Jackson presented the theory that Frankie was the shooter on October 5, 2006.  To support this theory, Jackson pointed to the testimony of the witness at the bus stop who said that the shooter appeared older and had dark skin, a description the defense argued was more consistent with Frankie than Jackson.  There was also testimony that Frankie was the "most experienced guy" in the vehicle.

Jackson's counsel further highlighted that, before trial, Morris had told two other versions of his story, one of which he devised with Jackson when they were inadvertently placed in a holding cell together.  When asked about his different versions on the witness stand, Morris explained that the first version was inaccurate because he was unsure of what his friends were saying.  The second version, which placed Jackson in the driver's seat and blamed Frankie for the shooting, Morris admitted, had been fabricated by Morris and Jackson together. Morris testified that he decided to tell the truth when he believed it was inevitable that the truth would come out.  When the defense suggested to Morris that he had to tell a particular story in order to get his plea deal, he responded, "Well, I know I'm going to tell the truth. That's my plea."

State v. Jackson, 770 N.W.2d 470, 473-477 (Minn. 2009).

Petitioner was tried twice on 12 counts[2] in Hennepin County District Court.  The

_____

[2]      Count 1: first degree murder, Minn. Stat. § 609.185(a)(1) (2008) (premeditation); Count 2: first degree murder committed for the benefit of a gang, Minn. Stat. §§ 609.185(a)(1), 609.229 (2008); Count 3: first-degree murder while committing a drive-by shooting, Minn. Stat. § 609.185(a)(3) (2008); Count 4: first-degree murder committed for the benefit of a gang while committing a drive-by shooting, Minn. Stat. §§ 609.185(a)(3); 609.229:  Count 5: second-degree murder while committing a drive-by shooting, Minn. Stat. § 609.19 (2008); Count 6: second-degree murder committed for the benefit of a gang while committing a drive-by shooting, Minn. Stat. §§ 609.19, 609.229; Count 7: attempted murder, Minn. Stat. §§ 609.17, 609.185(a)(1) (2008); Count 8: attempted murder committed for the benefit of a gang, Minn. Stat. §§ 609.17, 609.185(a)(1), 609.229; Count 9: attempted first-degree murder while committing a drive-by shooting, Minn. Stat. §§ 609.17, 609.185(a)(3); Count 10:  attempted murder committed for the benefit of a gang while committing a drive-by shooting, Minn. Stat. §§ 609.17, 609.185(a)(3), 609.229; Count 11: drive-by shooting, Minn. Stat. § 609.66, subd. 1(e)(b) (2008); and Count 12: drive-by shooting committed for the benefit of a

State's theory at trial was that Petitioner had shot the victims in retaliation for the shooting of Markey, a fellow Bloods gang member. Id. at 473. Petitioner's theory was that Frankie was the shooter of the two victims. Id. at 477. A mistrial was declared after the first trial when the jury was unable to reach a unanimous verdict. Id. at 473. In the second trial, the jury found Petitioner guilty on all 12 counts. Id. at 473, 477. Petitioner was sentenced to life without parole for first-degree murder committed for the benefit of a gang, and a consecutive 186 months for attempted first-degree murder committed for the benefit of a gang. Id. at 477. Petitioner is currently serving his sentence at the Minnesota Correctional Facility at Oak Park Heights, Minnesota. Petition, p 1.

Petitioner filed a direct appeal in the Minnesota Supreme Court,[3] where he submitted a brief by his counsel, and a separate *pro se* supplemental brief. Docket No. 6-5 (Resp. Appx., Ex. D). Petitioner stated the following two grounds for relief in the brief by his counsel:

> I.  The State filed a "Prosecutor's Certificate" so that discovery about 10 witnesses would not be disclosed to the Defense, but the State continued the non-disclosure even after the witnesses were sworn to testify at trial, in violation of Criminal Rule 9.01, subd. 3(2).
>
> II.  To prove that the offenses were committed for the benefit of a gang, the State's presentation of evidence included evidence that was not relevant and that was unfairly prejudicial.

---

gang, Minn. Stat. §§ 609.66, subd. 1(e)(b), 609.229. Jackson, 770 N.W.2d at 473 n.1.

[3]  Because Petitioner was charged with first degree murder in Minnesota, his direct appeal was properly made to the Minnesota Supreme Court. See Minn. R. Crim. P. 29.02(a) and (d).

Resp. Appx., Ex. D (Appellant's Brief), p. i.  In his *pro se* brief, Petitioner submitted the

following four grounds for relief:

> 1.   The evidence was insufficient to prove beyond a
> reasonable doubt that Appellant was guilty of first degree
> murder because the State did not present any evidence that
> corroborates the accomplices (sic) allegations.
>
> 2.   The trial court committed reversible error by refusing to
> sever the three counts of the compliant (sic) from the last
> three counts of the compliant (sic).
>
> 3.   Apellant (sic) Jackson was deprived of due process and a
> fair trial when the trial judge violated Appellants 14th
> U.S.C.A. Const. Amends.; when the judge made the decision
> not to grant Appellants (sic) motion to dismiss the jury panel
> after they committed misconduct during trial.
>
> 4.   The prosecutor violated Appellants (sic) 5th, 6th, and 14th
> U.S.C.A. Const. Amends; when she committed prosecutorial
> misconduct by allowing coersed (sic) testimony to go
> unchecked during trial.

Resp. Appx., Ex. D (Appellant's Pro Se Supplemental Brief), p. 3.

The Minnesota Supreme Court rejected all of Petitioner's grounds for appeal and

affirmed his conviction.

## II.   THE HABEAS PETITION AND THE STATE'S ANSWER

On October 22, 2009, Petitioner filed his current federal habeas corpus petition,

raising six grounds for relief:

> Ground One, Discovery Violation:   [T]he State filed a "Prosecutor
> Certificate" so that discovery about 10 witnesses would not be disclosed to
> the defense, but the State continued the non-disclosure even after the
> witness (sic) were sworn to testify at trial, in violation of Criminal
> Rule 9.01, subd. 3(2).
>
> Ground Two, Benefit of a Gang Evidence:   [T]o prove that the offenses
> were committed for the benefit of a gang, the State's presentation of
> evidence included evidence that was not relevant and that was unfairly
> prejudicial.

Ground Three, Insufficient Evidence: [T]he evidence was insufficient to prove beyond a reasonable doubt that appellant was guilty of first degree murder because the State did not present any evidence that corroborates the accomplices (sic) allegations.

Ground Four, Refusing to Sever Counts: [T]he trial court committed reversible error by refusing to sever the three counts of the compliant (sic) from the last three counts.

Ground Five, Jury Misconduct: Appealant (sic) was deprived of due process and fair trial when the trial judge violated appellant's 14th U.S.C.A. Const. Amends; when the judge made the decision not to grant Appellant's motion to dismiss the jury panel after they committed misconduct during trial.

Ground Six, Prosecutor Misconduct: [T]he prosecutor violated the Appellant's 5th, 6th and 14th U.S.C.A. Const. Amend; when she committed prosecutorial misconduct by allowing coeresd (sic) testimony to go unchecked during trial.

Petition, pp. 4-6.

Respondent filed an Answer to the Petition on November 18, 2009. Answer to Petition for Writ of Habeas Corpus ("Resp. Answer") [Doc. No. 5]. Pursuant to Rule 5(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the Respondent asserted that several of Petitioner's claims were barred by a failure to exhaust state remedies. Id., p. 1. In the next sentence, Respondent stated, "none of Petitioner's claims is barred by a procedural bar, non-retroactivity, or a statute of limitations." Id.

The same day, Respondent filed a memorandum in support of its opposition to the habeas petition. Resp. Mem. [Doc. No. 6]. Respondent contended that the Petition should be dismissed because Petitioner had failed to exhaust Grounds Three, Five and Six and, despite Respondent's contrary assertion in her Answer, maintained that these grounds were procedurally defaulted. Id.[4] As to Grounds One, Two, and Four,

---

[4] Respondent also submitted other reasons for dismissal of Grounds Five and Six.

Respondent argued that these grounds failed on their merits and should be dismissed on that basis.  Id.

Plaintiff submitted a responsive memorandum in which he asserted nearly verbatim the same arguments he had presented to the Minnesota Supreme Court in his appellant briefs.  Compare Doc. No. 8 (Pet. Mem.) with Docket No. 6-5 (Resp. Appx., Ex. D).  Petitioner did not address Respondent's contention that he had failed to exhaust and had procedurally defaulted Grounds Three, Five and Six of the Petition.

## III.  RELEVANT LAW BEARING ON HABEAS PETITIONS

### A.  Habeas Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners.  Section 2254 of the AEDPA provides that a district court will entertain a petition for writ of habeas corpus submitted by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  In addition, 28 U.S.C. § 2254 provides that a habeas corpus petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Eighth Circuit has described the review under § 2254(d)(1) as follows:

> A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrived at an opposite result. Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court "unreasonably applies" federal law when it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407, 120 S.Ct. 1495.
>
> A federal court may not issue the writ simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411, 120 S.Ct. 1495.

Engesser v. Dooley, 457 F.3d 731, 735-36 (8th Cir. 2006) cert. denied, 549 U.S. 1223 (2007). Under this standard, the federal court "must deny a writ – even if we disagree with the state court's decision – so long as that decision is reasonable in view of all the circumstances." May v. Iowa, 251 F.3d 713, 716 (8th Cir. 2001) (citing Williams, 529 U.S. at 409-13.)

However, where the state court did not explicitly analyze or adjudicate a petitioner's claims under federal law on appeal, although the federal nature of the claims was fairly presented to the state court, the less deferential standard of review for habeas corpus cases before AEDPA should be applied. See Middleton v. Roper, 455 F.3d 838, 856 (8th Cir. 2006) cert. denied, 549 U.S. 1134 (2007) (where state court did not adjudicate constitutional claim on the merits, court reviewed district court's factual findings for clear error and conclusions of law de novo); Taylor v. Bowersox, 329 F.3d 963, 967-68 (8th Cir. 2003) cert. denied, 541 U.S. 947 (2004) ("Under the …

AEDPA, we apply a deferential standard of review to state court resolutions of law and fact only if the state court adjudicated the prisoner's claim on its merits. 28 U.S.C. § 2254(d); Kenley v. Bowersox, 275 F.3d 709, 711 (8th Cir. 2002) cert. denied, 537 U.S. 919 and reh'g denied, 537 U.S. 1069.  Here, the state court did not adjudicate Taylor's claims on their merits and, therefore, section 2254(d) does not apply. See Haley v. Cockrell, 306 F.3d 257, 263 (5th Cir. 2002) (reversed on other grounds).  We review the district court's findings of fact for clear error and its legal conclusions de novo. Id."));  Kittrell v. Von Wald, Civil No. 05-2796 (DSD/FLN), 2007 WL 1114816, at *5 (D.Minn. April 13, 2007) ("where the state courts never discussed Petitioner's current constitutional claims in any detail," the court reviewed petitioner's claims under the pre-AEDPA standard of review, "i.e. without giving any special deference to the underlying state court decisions"); see also Bertram v. Bertsch, No. 1:08-cv-093, 2009 WL 1688183, at * 11 (D.N.D. June 16, 2009) ("If AEDPA deference is not appropriate, then the pre-AEDPA standard of de novo review applies to questions of law and mixed questions of law and fact." (citing Brown v. Allen, 344 U.S. 443 (1953); Williams v. Taylor, 529 U.S. at 400-402 (O'Connor, J., concurring opinion); Canaan v. McBride, 395 F.3d 376, 383 (7th Cir. 2005); Clemons v. Luebbers, 381 F.3d 744, 756 n.8 (8th Cir. 2004); Taylor, 329 F.3d at 967-68; Robinson v. Crist, 278 F.3d 862, 865  (8th Cir. 2002) (citing Washington v. Schriver, 255 F.3d 45, 55 (2d Cir. 2001)); Appel v. Horn, 250 F.3d 203, 211-12 (3rd Cir. 2001)).  "Under . . . [the pre-AEDPA] standards, we review the District Court's conclusions of law de novo, and give the state court's factual findings a 'presumption of correctness.'"  Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002) cert. denied, 537 U.S. 909 (quoting Jones v. Delo, 258 F.3d 893, 901 (8th Cir. 2001) (citations omitted)).

## B.    **Exhaustion and Procedural Default**

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The United States Supreme Court has repeatedly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See also U.S. v. Armstrong, 554 F.3d 1159, 1166 (8th Cir. 2009) cert. denied, 129 S.Ct. 2805 ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.") (quoting Smith v. Phillips, 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (citations omitted)).

Therefore, before a federal district court can review a federal constitutional claim of a state prisoner in a § 2254 habeas corpus proceeding, "the prisoner must exhaust his remedies in state court."  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  O'Sullivan v. Boerckel, 526 U.S. 838, 843 (1999).  This requirement is explained by the United States Supreme Court as follows:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. 2254(b)(1), thereby giving the State the "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights." . . . To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "A petitioner meets the fair presentation requirement if the state court rules on the merits of his claims, or if he presents his claims in a manner that entitles him to a ruling on the merits." Gentry v. Lansdown, 175 F.3d 1082, 1083 (8th Cir. 1999) (citation omitted).

A federal claim is deemed to be unexhausted if the claim has not been fairly presented in one complete round of the state's established appellate review process, O'Sullivan, 526 U.S. at 845, but the petitioner has the right, under state law, to raise the claim by any available procedure. See 28 U.S.C. § 2254(c).[5] These requirements are based on the principles of comity and federalism; their purpose is to ensure that state courts are given the first opportunity to correct alleged federal constitutional errors raised by state prisoners. See O'Sullivan 526 U.S. at 844 (citing Rose v. Lundy, 455 U.S. 509, 515-516 (1982); Darr v. Burford, 339 U.S. 200, 204 (1950)).

While a state prisoner seeking federal habeas relief is not required to have spelled out every nuance of his federal constitutional claims to the state courts, nevertheless, if a claim is based on the federal constitution, the prisoner must "fairly present the facts and substance of his habeas claim to the state court." Middleton, 455 F.3d at 855 (citation omitted); see also McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) ("Mere similarity between the state law claims and the federal habeas claims is insufficient: 'If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.'") (quoting Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam). Additionally, "[t]o be fairly presented a

_____

[5]    28 U.S.C. § 2254(c) states: "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

petitioner is required to refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue. Presenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir.), cert. denied, 546 U.S. 844 (2005) (internal quotation marks and citations omitted); see also Adams v. Robertson, 520 U.S. 83, 89 n. 3 (1997) ("passing invocations of 'due process' . . . [that] fail to cite the Federal Constitution or any cases relying on the Fourteenth Amendment . . . [do] not meet our minimal requirement that it must be clear that a federal claim was presented") (emphasis in original) (citation omitted).

"Ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin, 541 U.S. at 32. However, even if the opinion of the state court of appeals does not make any mention of a federal claim, a brief submitted to that court that sets forth the federal constitutional basis for a claim can satisfy the requirement that the petitioner "apprise the state court of his claim that the … ruling of which he complained was not only a violation of state law, but denied him [rights] guaranteed by the [federal constitution]." Dye v. Hofbauer, 546 U.S. 1, 4 (2005) (quoting Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam)).

Generally, "[w]hen a state court remedy is available for a state prisoner's unexhausted claim, the federal habeas court must defer action until the claim is exhausted, either by dismissing the federal petition without prejudice or by using the 'stay and abeyance' procedure described in Rhines v. Weber, [544 U.S. 269]... (2005)."

Armstrong v. Iowa, 418 F.3d 924, 926 (8th Cir. 2005), cert. denied, 546 U.S. 1179 (2006). However, when a prisoner has not exhausted his state court remedies for some particular claim, and state procedural rules preclude any further attempts to satisfy the exhaustion requirement as to that claim, then the claim is not truly "unexhausted," but rather, it has been "procedurally defaulted." Coleman v. Thompson, 501 U.S. 722, 750 (1991); McCall, 114 F.3d at 757. In other words, if there is still a state court remedy available, a previously unraised habeas claim is "unexhausted," but if there is no state court remedy still available, then the claim is "procedurally defaulted." See Armstrong v. Iowa, 418 F.3d at 926 ("if no state court remedy is available for the unexhausted claim – that is, if resort to the state courts would be futile – then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim...'") (quoting Gray v. Netherland, 518 U.S. 152, 162 (1996). See also Middleton, 455 F.3d at 855 ("'If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now.'") (quoting Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir.) (en banc), cert. denied, 517 U.S. 1215 (1996).

In sum, a constitutional claim is procedurally defaulted if the state courts will no longer review it because an independent and adequate state procedural rule precludes further litigation of the claim. Coleman, 501 U.S. at 750 (1991); McCall, 114 F.3d at 757.

A claim that has been procedurally defaulted cannot be entertained in a federal habeas corpus proceeding, unless the petitioner has shown "cause and prejudice" to excuse his procedural default, or, in the alternative, that there would be a "fundamental

miscarriage of justice" if the federal court declined to consider the claim.  Coleman, 501 U.S. at 750.

"'Cause' . . . must be something external to the petitioner, something that cannot fairly be attributed to him. . . .  For example, 'a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that 'some interference by officials' . . . made compliance impracticable. . . .'"  Coleman, 501 U.S. at 753 (citations omitted) (emphasis in original).   "Prejudice" that will overcome a procedural default requires a showing by a petitioner "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Armstrong v. Kemna, 590 F.3d 592, 606 (8th Cir. 2010) cert. denied, 130 S.Ct. 3369 (quoting United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). A court need not determine the "cause" issue, if it first determines that the petitioner has not made a showing of prejudice.  Id. at n.12.

The "fundamental miscarriage of justice" exception requires a "showing, based on new evidence, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'"  Brownlow v. Groose, 66 F.3d 997, 999 (8th Cir. 1995) cert. denied, 516 U.S. 1161 (1996) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995) (emphasis added)).   Thus, for the miscarriage of justice exception to excuse a procedural default, it is not enough for a petitioner to point out errors at trial; instead, he must offer some new evidence which demonstrates that he is innocent of the crime for which he was convicted.

If a petitioner is unable to show cause and prejudice, or a miscarriage of justice, the procedural default cannot be excused, and the court will deny the claim without

addressing its merits.  See Carney v. Fabian, 441 F.Supp.2d 1014, 1029 (D.Minn. 2006).

The Court now applies these principles to Petitioner's claims.

## IV.    ANALYSIS

### A.    <u>Exhaustion and Procedural Default of Grounds Two, Three, Four, Five and Six</u>

Respondent asserted Petitioner's claims of insufficiency of the evidence (Ground Three), jury misconduct (Ground Five), and prosecutorial misconduct (Ground Six) should be dismissed because they are unexhausted and procedurally defaulted, and Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to excuse his procedural default.  For the reasons discussed below, the Court agrees that Petitioner's claim of insufficiency of the evidence (Ground Three) should be dismissed on these grounds.  Further, while Respondent did not raise in its response lack of exhaustion and procedural default as to Grounds Two (benefit of gang affiliation evidence) and Four (refusal to sever counts), this Court concludes that these two claims must be dismissed because they too are unexhausted and procedurally defaulted and there is no evidence before this Court to suggest cause and prejudice or a fundamental miscarriage of justice to justify the procedural default of these claims.[6]

---

[6]    The Eighth Circuit permits courts to raise sua sponte a petitioner's failure to exhaust and procedural default in the appropriate circumstances.  See Cagle v. Norris, 474 F.3d 1090, 1098 (8th Cir. 2007) ("All federal circuit courts of appeal have 'held that, in appropriate circumstances, courts, on their own initiative, may raise a petitioner's procedural default.'") (quoting Day v. McDonough, 547 U.S. 198, 126 S.Ct. 1675, 1682, 164 L.Ed.2d 376 (2006)); King v. Kemna, 266 F.3d 816, 822 (8th Cir. 2001) (en banc) cert. denied, 535 U.S. 934 (2002) (finding the court has the discretion to consider issue of procedural default sua sponte; Fudge v. Norris, No.5:06CV00183 JLH-JFF, 2008 WL 450385, at *10 (E.D. Ark., February 15, 2008) ("It is well established that a federal court may raise sua sponte the issue of procedural bar.") (citations omitted).  Even an express waiver by the respondent of the exhaustion defense, pursuant to 28 U.S.C. § 2254(b)(3), does not bar a federal habeas court from addressing the issue.  See

Bannister v. Delo, 100 F.3d 610, 623, n.14 (8th Cir. 1996) cert. denied, 521 U.S. 1126 (1997) and reh'g denied, 521 U.S. 1145 ("the purpose of exhaustion is . . . to. . . channel claims into an appropriate forum. . . We should no more tolerate disregard for this principle by the State than by the habeas petitioner.") (internal citations omitted).

Here, Petitioner was given the opportunity to respond to Respondent's arguments of exhaustion and procedural default as to Grounds Three, Five and Six, but did not do so. But he was not alerted in advance that the Court would analyze Grounds One and Two for exhaustion and procedural default, and consequently, was not given the opportunity to specifically address these issues as to these claims. A habeas petitioner must be given notice and opportunity to be heard on an issue raised sua sponte by the court when the court thereby recommends dismissal of the petition. See Day, 547 U.S. at 210 ("Of course, before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions). That right will be met in this case by permitting Petitioner to present any factual or legal arguments bearing on his failure to exhaust, procedural default, cause and prejudice or fundamental miscarriage of justice, by filing objections to this Court's Report and Recommendation. See Magourik v. Phillips, 144 F.3d 348, 360 (5th Cir. 1998) (where habeas court sua sponte raises issue of procedural default, it should consider whether justice requires that the petitioner be afforded notice and opportunity to present briefing and argument opposing dismissal); Mitchell v. Director TDCJ-CID, Civil Action No. 1:10CV600, 2010 WL 5330495, at *1 (E.D.Tex., Dec. 20, 2010) ("Petitioner argues that pursuant to Day v. McDonough, 547 U.S. 198, 209, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006), he was not given 'notice' or an 'opportunity to be heard' before the magistrate judge sua sponte recommended dismissal of the present petition on statute of limitations grounds. The magistrate judge's report and recommendation serves as notice that the District Court may dismiss petitioner's application for habeas corpus relief as time-barred and the opportunity to file objections constitutes petitioner's opportunity to be heard.") (citation omitted); Rowann v. District of Erie, Civil Action No. 09-78 Erie, 2010 WL 1052959, at *3 (W.D.Pa., Mar. 22, 2010) ("Where the Magistrate Judge raises the statute of limitations issue sua sponte in her Report and Recommendation, fair notice is provided by mailing the petitioner a copy of the report and giving him an opportunity to file objections or otherwise respond.") (citation omitted); Green v. Cal. Dep't of Corr., No. CV 08-08563 DSF (AN), 2009 WL 393780, at *3 (C.D.Cal., Feb. 17, 2009) ("[A]n untimely habeas petition may be dismissed sua sponte, however, the district court must give the petitioner adequate notice and an opportunity to respond before doing so. This Report and Recommendation constitutes adequate notice, and Petitioner's opportunity to file objections provides him with a reasonable opportunity to respond.") (citation omitted); Yeager v. Hudson, No. 3:07-cv-131, 2008 WL 818788, at *10 (N.D. Ohio, Mar. 24, 2008) (citing Wogoman v. Abramajtys, 243 Fed. Appx. 885, 890 n.4 (6th Cir. 2007) (holding petitioner received notice of petition's untimeliness in the magistrate judge's report and recommendation, and had opportunity to be heard by the district court through objections to the Report and Recommendation); Cooper v. Pennsylvania State Atty. Gen, No. 2:06cv1332, 2007 WL 2492726, at *2 (W.D.Pa., Aug. 30, 2007) (in disposing of habeas petition sua sponte based on the statute of limitations, court held that the report and recommendation procedure with its opportunity to file objections provided the required notice and opportunity to be heard, citing to Magouirk, 144 F.3d at 359; Canady

### 1. Gang Affiliation Evidence – Ground 2

In Ground Two of the Petition, Petitioner stated that "to prove that the offenses were committed for the benefit of a gang, the State's presentation of evidence included evidence that was not relevant and that was unfairly prejudicial." Specifically, Petitioner challenged the admission of "four pieces of evidence introduced by the State to prove that Jackson committed crimes 'for the benefit of a gang,' an element included in 6 of the 12 counts in the indictment[:]… (1) two photographs of a graffiti-covered t-shirt worn by Morris when he was arrested; (2) a web page picturing [Petitioner] and his girlfriend; (3) police testimony about a prior contact with [Petitioner] on July 21, 2006; and (4) police testimony about [Petitioner]'s arrest on December 29, 2005." Jackson, 770N.W.2d at 481-482; see also, Pet. Mem., pp. 21-22.

In support of this claim, Petitioner presented virtually the identical argument that he made to the Minnesota Supreme Court. Compare Doc. No. 8 (Pet. Mem.), pp. 21-37 with Docket No. 6-5 (Resp. Appx., Ex. D (Appellant Brief), pp. 37-49). While not dispositive of the issue of exhaustion, neither the trial court judge, the Honorable Denise D. Reilly, nor the Minnesota Supreme Court made any mention in their opinions of any federal constitutional challenge made by Petitioner at trial or in his appeal to the state court. See Docket No. 6-5 (Resp. Appx., Ex. C (Respondent's Appendix to

---

v. Baker, 142 F.3d 432 (Table), 1998 WL 123996, at *1 (6th Cir.1998); United States v. Willis, 273 F.3d 592, 597 n. 6 (5th Cir.2001)); Smith v. Dorsey, No. 93-2229, 1994 WL 396069, at *3 (10th Cir., July 29, 1994,) (unpublished) (finding "no due process problem" where magistrate judge raised issue of procedural bar sua sponte and petitioner had opportunity to object to report and recommendation prior to its adoption); Nixon v. Beard, No. 093721, 2010 WL 165137, at *1 (3rd Cir. Jan. 19, 2010) (unpublished) (where magistrate judge raised statute of limitations sua sponte in report and recommendation, fair notice was provided by mailing petitioner a copy of the report and giving him an opportunity to file objections or otherwise respond).

The procedure for filing objections is stated at the end of this Report and Recommendation.

Respondent's Brief to Minnesota Supreme Court ("Resp. MSSC Appx.")), pp. 24-29); Jackson, 770 N.W.2d at 481-484. However, of critical importance, his appellant brief to the Minnesota Supreme Court (like Petitioner's brief to this Court) made no reference to "a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." McCall, 114 F.3d at 757 (citations and internal quotation marks omitted).

It is true that in both his brief to the Minnesota Supreme Court and this Court, Petitioner cited to Michelson v. United States, 335 U.S. 469, 475-76 (1948) for the proposition that the testimony regarding incidents on December 29, 2005 and July 21, 2006, should have not been admitted because the testimony amounted to improper character evidence pursuant to Minn. R. Evid. 404(b). See Docket No. 6-5 (Resp. Appx., Ex. D (Appellant Brief)), p. 47-49); Doc. No. 8 (Pet. Mem., p. 34-36). In this regard, Petitioner recited the following excerpt from Michelson which had been quoted by the Minnesota Supreme Court in State v. Loebach, 310 N.W.2d. 58, 63-64 (Minn. 1981):

> The state may not show the defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise, and undue prejudice.

Appellant Brief, pp. 48-49; Pet. Mem., pp. 35-36. But, just as this excerpt does not

present a constitutional issue, the <u>Michelson</u> decision did not address a federal constitutional challenge to the use of character evidence. <u>See</u> <u>McCall</u>, 114 F.3d at 757 ("Indeed, the very case that [Petitioner] contends supports his assertion that his state law claims incorporate his federal habeas claims fails to discuss, or to even refer to, the federal constitution."). The issue before the Supreme Court in <u>Michelson</u> was the nature and scope of character evidence the prosecution could use in a federal case to cross-examine character witnesses called by the defendant to testify regarding his good reputation.[7]

Where Petitioner did not fairly present a violation of the federal constitution to the Minnesota Supreme Court with respect to his gang affiliation evidence claim, this Court concludes that he did not exhaust the claim.[8]

---

[7]     Similarly, the issue before the Minnesota Supreme Court in <u>Loebach</u> focused on the admissibility of character evidence used by the State pursuant to Minn. R. Evid. 404(a). No constitutional violation was mounted or discussed in <u>Loebach.</u>

[8]     "In the habeas context, '[r]ules of evidence and trial procedure are usually matters of state law. A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process.'" <u>Bucklew v. Luebbers</u>, 436 F.3d 1010, 1018 (8th Cir. 2006) <u>cert.</u> <u>denied</u>, 549 U.S. 1079 (quoting <u>Adail v. Wyrick</u>, 711 F.2d 99, 102 (8th Cir. 1983)). Had Petitioner claimed that the state evidentiary ruling violated his right to due process under the federal constitution, the federal habeas court could reverse the ruling,

> only if the petitioner ... show[s] that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair. To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial – i.e., that absent the alleged impropriety the verdict probably would have been different. Of particular importance is the frequency and pervasiveness of the alleged misconduct in the context of the entire trial, the weight of the evidence supporting guilt, and whether the trial judge gave a cautionary instruction to the jury on how to properly use the testimony elicited.

Having determined that Petitioner failed to fairly present his federal habeas claims to the state court, the Court must now address whether Minnesota state law would prevent him from raising these claims in a state court.  See McCall, 114 F.3d at 757 (citation omitted).  Stated otherwise, generally when a petition contains unexhausted claims, the Court would recommend that the petition be dismissed without prejudice, so that Petitioner could return to the state courts and attempt to pursue his currently unexhausted claims through the filing of a motion for post-conviction relief with the trial court.  See Minn. Stat. § 590.01 (allowing a convicted individual who claims that the conviction obtained or the sentence or other disposition made against him violated his rights under the Constitution or laws of the United States to commence a proceeding to secure relief by filing a petition to vacate and set aside the judgment and to discharge the petitioner or to resentence the petitioner or grant a new trial or correct the sentence).  However, under Minnesota law, "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered

---

Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995) (internal quotations omitted and citations omitted).

Based on this standard, even if the allegedly irrelevant and prejudicial character evidence had been excluded (an incident on December 29, 2005, where a vehicle in which Petitioner was a passenger was stopped by Minneapolis police, and resulted in Petitioner's arrest for disorderly conduct; and an incident on July 21, 2006, in which Minneapolis police saw Petitioner standing and drinking beer near a vehicle that was not his), this Court finds, as did the Minnesota Supreme Court, that the "[i]n light of the 'cascade of evidence' on gang affiliation and the substantial evidence of [Petitioner's] guilt," that the outcome of the trial would not have been different.  Jackson, 770 N.W.2d at 484 (quoting Docket No. 6-5 (Resp. Appx., Ex. D (Appellant Brief)), p. 42) ("In addition to this cascade of evidence on whether the offense were committed 'for the benefit of a gang' the state introduced evidence that was irrelevant and unfairly prejudicial to appellant, including evidence of a gang graffiti-covered T-shirt worn by Morris at the time of his arrest, police testimony about two prior instances of contact they had with appellant, and evidence of a web page featuring a photograph of appellant and his girlfriend"); see also Pet. Mem., pp. 27-28 (same).

upon a subsequent petition for postconviction relief." <u>State v. Knaffla</u>, 243 N.W.2d 737, 741 (1976). This rule, called the <u>Knaffla</u> rule, is well settled state law. <u>Powers v. State</u>, 731 N.W.2d 499, 501 (Minn. 2007). Claims which are "known" include those available after trial and which could have been raised on direct appeal. <u>See</u> <u>Townsend v. State</u>, 723 N.W.2d 14, 18 (Minn. 2006) (citation omitted).

There are two exceptions to the <u>Knaffla</u> rule. First, if a claim is known to the petitioner at the time of an appeal but is not raised, it will not be barred if its novelty was so great that its legal basis was not reasonably available when the direct appeal was taken; and second, even if the claim's legal basis was sufficiently available, when fairness so requires the review and the petitioner did not deliberately and inexcusably fail to raise the issue on direct appeal. <u>See</u> Townsend, 723 N.W.2d at 18 (citations omitted); <u>see</u> <u>also</u> <u>Powers v. State</u>, 731 N.W.2d 499, 502 (Minn. 2007) ("There are two exceptions to the <u>Knaffla</u> rule: (1) if a novel legal issue is presented, or (2) if the interests of justice require review.")

Based on the <u>Knaffla</u> rule, this Court concludes that if Petitioner filed a post-conviction petition to raise a federal due process violation in connection with the admission of the four pieces of evidence introduced by the State, under Minnesota law he would be barred from making such claim because the matter regarding the admissibility of this evidence had already been raised on direct appeal, the federal constitutional challenge was available to him at that time, and there is no evidence to suggest that this federal claim was unknown or so novel that could not have presented in the direct appeal. <u>See</u> <u>McCall</u>, 114 F.3d at 757-58 (based on the <u>Knaffla</u> rule, court concluded that Petitioner is precluded from returning to state court to raise a federal constitutional claim after a direct appeal where there is no evidence his federal claims

were unknown or were so novel that their legal basis was unknown at the time of direct appeal). On this basis, the Court finds that Petitioner has procedurally defaulted on his gang affiliation evidence claim.

Further, there is nothing in the record from which this Court could find cause for the default and actual prejudice or a fundamental miscarriage of justice so as to excuse Petitioner's procedural default of the gang affiliation evidence claim.

For all of these reasons, this Court recommends that Ground Two be dismissed.

### 2. Insufficiency of the Evidence – Ground Three

In Ground Three of the Petition, entitled "Insufficient Evidence," Petitioner stated "the evidence was insufficient to prove beyond a reasonable doubt that appellant was guilty of first degree murder because the State did not present any evidence that corroborates the accomplices (sic) allegations." Petition, p. 5. Similarly, in Petitioner's pro se appellant brief submitted to the Minnesota Supreme Court, Petitioner stated in the caption of "Argument 1" that "The Evidence Was Insufficient to Prove Beyond a Reasonable Doubt That Appellant was Guilty of First Degree Murder Because the State Did not Present Any Evidence That Corrorated (sic) the Accomplices (sic) Allegations." Docket No. 6-5 (Resp. Appx., Ex. D (Appellant's Pro Se Supp. Brief)), p. 3). In his briefs to the Minnesota Supreme Court and to this Court, Petitioner made virtually identical arguments. Compare Appellant Pro Se Supp. Brief, pp. 5-6 with Pet. Mem., pp. 37-39. In the first sentence of both briefs, Petitioner cited In re Winship, 397 U.S. 358, 364 (1970) for the proposition that "the state must prove every element of a charged crime beyond a reasonable doubt" and then set out the standard under state law for reviewing a challenge to the sufficiency of evidence. See Appellant Pro Se Supp. Brief, p. 5; Pet.

Mem, p. 37.[9]  The balance of the discussion in these briefs was directed not at the jury verdict, but at the grand jury's finding of probable cause leading to the indictment. Appellant Pro Se Supp. Brief, pp. 5-6; Pet. Mem, pp. 37-39.  Specifically, Petitioner submitted that "[t]he for the benefit of a gang counts should have been dismissed, because the grand jury would not have returned any gang related count but for the inadmissible gang expert testimony presented."  Appellant Pro Se Supp. Brief, p. 5; Pet. Mem, p. 37-38.  Petitioner then cited state law regarding the admissibility of evidence to prove the element of "for the benefit of a gang."  Id.  Based on this argument, the Minnesota Supreme Court framed the issue made by Petitioner as follows:

> Before his first trial, Jackson moved to dismiss all six gang-related counts in the indictment under Minn. R. Crim. P. 17.06, subd. 2(1)(a) (insufficient evidence before the grand jury to establish the charged offense). On appeal, Jackson repeats the argument he made to the district court that "inadmissible and duplicative expert testimony . . . overrode the grand jurys [sic] ability to independently exercise its judgement [sic] resulting in the return of the twelve counts in the indictment." [footnote deleted] The district court denied Jackson's motion, concluding that the "liberal construction of evidentiary rules in grand-jury proceedings and the high burden Defendant must meet to justify dismissing an indictment" did not warrant dismissal in this case.

Jackson, 770 N.W.2d at 484-85.[10]

Respondent asserted that Ground Three should be dismissed based on unexhaustion because Petitioner did not present his insufficiency of evidence argument on appeal to the Minnesota Supreme Court.  See Resp. Mem., p. 20.  Respondent also

---

[9]    In Winship, the U.S. Supreme Court stated "we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364.

[10]    In its responsive brief to the Minnesota Supreme Court, the State ignored the caption of Argument I because the text was unrelated to the caption.  See Docket No. 6-5 (Resp. Appx., Ex. C (Respondent's Brief)), p. 28).

contended the claim was procedurally defaulted, and Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to excuse his procedural default. Id., pp. 21-22. Petitioner did not respond to Respondent's contention that Ground Three should be dismissed on these grounds.

This Court agrees with Respondent. Petitioner did not exhaust Ground Three because he did not fairly present the federal nature of his claim that the grand jury had insufficient evidence to determine probable cause. Other than his citation to In re Winship for a proposition that has no bearing on the issue he presented to the Minnesota Supreme Court, no pertinent federal constitutional issue was brought to the attention of the state court. See Cox, 398 F.3d at 1031 (finding the petitioner never argued recantation claim was constitutional error). "Before a state prisoner is entitled to federal habeas corpus relief, he first must exhaust his state law remedies and fairly present the facts and substance of his habeas claim to the state court." Middleton, 455 F.3d at 855. Here, neither the facts nor the substance of his argument raised a federal constitutional claim. Indeed, the Minnesota Supreme Court made no mention of the topic raised by the caption of the appeal.

Further, this Court finds that Ground Three is procedurally defaulted under the Knaffla rule, Petitioner has not established (much less addressed) the application of either exception to the Knaffla rule (whether the claim presents a novel legal issue or the interests of justice require review), and he has not attempted to show and the record does not support a finding of cause and prejudice or a fundamental miscarriage of justice to excuse his procedural default.

For all of these reasons, this Court recommends that Ground Three be dismissed.

### 3. Refusing to Sever Counts – Ground Four

Ground Four of the Petition states "the trial court committed reversible error by refusing to sever the three counts of the compliant (sic) from the last three counts." Petition, p. 5. Like his brief to this Court, in his pro se brief to the Minnesota Supreme Court, Petitioner argued that pursuant to Minn. R. Crim. P. 17.03 and state law, the district court abused its discretion in refusing to sever the offenses. See Jackson, 770 N.W.2d at 485; Pet. Mem, pp. 40-42; Docket No. 6-5 (Resp. Appx., Ex. D (Appellant Pro Se Supp. Brief)), pp. 6-7). At the end of the argument, Petitioner stated: "Moreover, joiner (sic) of the two offenses violated appellant Jackson's constitutional rights to a fair trial." Pet. Mem., p. 42; Appellant Pro Se Supp. Brief, p. 7. The Minnesota Supreme Court rejected Petitioner's severance claim solely on state law ground. Jackson, 770 N.W.2d at 485.

Although Respondent did not assert Petitioner's failure to exhaust when arguing dismissal of Ground Four, this Court sua sponte recommends dismissal on this basis. Petitioner's arguments concerning the trial court's denial of his motion to sever counts, both to the Minnesota Supreme Court and in his responsive memorandum to this Court, rely solely on state law, and made no mention of "a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." Cox, 398 F.3d at 1031. Petitioner's singular and passing reference to "appellant's constitutional rights to a fair trial" in his brief to the state court did not alert the court to a federal claim. See Adams, 520 U.S. at 89 n. 3 ("passing invocations of 'due process' [that] fail to cite the Federal Constitution or any cases relying on the Fourteenth Amendment ... [do] not meet our minimal requirement that it must be clear that a federal claim was presented") (emphasis in original); McCall,

114 F.3d at 757 ("Mere similarity between the state law claims and the federal habeas claims is insufficient: If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.") (citation and internal quotation marks omitted).

Like Grounds Two and Three, this Court also finds Ground Four is procedurally defaulted under the <u>Knaffla</u> rule, and the record does not support the application of either exception to the <u>Knaffla</u> rule or a finding of cause and prejudice or a fundamental miscarriage of justice to excuse his procedural default.

For all of these reasons, it is recommended that Ground Four be dismissed.

### 4. Jury Misconduct Claim and Prosecutorial Misconduct – Grounds Five and Six

In his Petition, Petitioner described Grounds Five and Six as follows:

> Ground Five, Jury Misconduct: Appealant (sic) was deprived of due process and fair trial when the trial judge violated appellant's 14th U.S.C.A. Const. Amends; when the judge made the decision not to grant Appellant's motion to dismiss the jury panel after they committed misconduct during trial.

> Ground Six, Prosecutor Misconduct: [T]he prosecutor violated the Appellant's 5th, 6th and 14th U.S.C.A. Const. Amend; when she committed prosecutorial misconduct by allowing coeresd (sic) testimony to go unchecked during trial.

(Petition, p. 6).

Petitioner presented the identical claims in his pro se supplemental brief to the Minnesota Supreme Court on direct appeal of his conviction. <u>See</u> Docket No. 6-5 (Resp. Appx., Ex. D (Appellant Pro Se Supp. Brief)), pp. 7-8.

Respondent contends that Petitioner failed to exhaust both Grounds Five and Six, claiming that he did not fairly present a federal claim or federal violation. <u>See</u> Resp.

Mem., pp. 24-28.  While Petitioner did not address this contention in his responsive brief, the Court finds otherwise.

By citing due process and the right to a fair trial in conjunction with the 14th Amendment to the United States Constitution with respect to his jury misconduct claim, Petitioner fairly alerted the Minnesota Supreme Court to the federal constitutional nature of his claim.  Likewise, with respect to his prosecutorial misconduct claim, Petitioner explicitly presented the federal constitutional nature of this claim to the State's highest court.  On this basis, the Court will address the merits of both Petitioner's jury misconduct and prosecutorial misconduct claims below.

In summary, the Court recommends that Grounds Two, Three and Four of the Petition should be dismissed with prejudice based on unexhaustion, procedural default and lack of evidence to show cause and prejudice or fundamental miscarriage of justice to excuse the procedural default of the claim.

**B.    The Merits of Claims Stated in Grounds One, Five and Six**

**1.    Discovery Violation – Ground One**

In Ground One of the Petition, Petitioner presented his discovery violation claim as follows: "[T]he State filed a 'Prosecutor Certificate' so that discovery about 10 witnesses would not be disclosed to the defense, but the state continued the nondisclosure even after the witness[es] were sworn to testify at trial, in violation of criminal rule 9.01, Subd. 3(2)."  Petition, p. 4.  This claim was identical to the claim he submitted to the Minnesota Supreme Court in his direct appeal.  See Doc. No. 6-5 (Resp. Appx., Ex. D (Appellant's Brief)), pp. i, 23).  In his submission to the Minnesota Supreme Court and his responsive memorandum to this Court, Petitioner argued:

In the context of a first-degree murder trial, where appellant faced a life sentence without parole if convicted, the state deployed a powerful prosecution tool to limit and control the discovery it was required to provide the defense about 10 witnesses. That tool, Rule 9.01, subd. 3(2), is limited by a fundamental requirement of fairness - that the non-disclosure not extend beyond the time the witnesses are sworn to testify at trial. The state sought - and received - benefit of the rule without following its requirements for fairness. As a result, appellant was deprived of his due process right to a fair trial. <u>See</u> U.S. Const. Amend. VI; Minn. Const. Art. 1, Sec. 6 (providing the right to a fair trial). Time and again, appellant unsuccessfully objected and asked for complete discovery. Appellant's ability to prepare for trial with full knowledge about the evidence arrayed against him was limited, and cross-examination was impaired.

Appellant's Brief, p. 36; Pet. Mem., p. 20.

In the preamble of his responsive brief to this Court, Petitioner stated in the first headnote: "The Due Process Clauses of the U.S. and Minnesota Constitutions require that a criminal defendant be treated with fundamental fairness and be given a meaningful opportunity to present a complete defense." (Pet. Mem., p. 1) (citing U.S. Const. Amend. VI; Minn. Const. Art. 1, Sec. 6; <u>State v. Goldstein</u>, 505 N.W.2d 332, 240 (Minn. Ct. App. 1993)). Petitioner also argued, "[i]n the instant case, the State's refusal to provide the identities of ten witnesses to defense counsel and their refusal to allow the defendant to possess copies of even the redacted discovery violates [Petitioner's] right to confrontation." Pet. Mem., p. 2 (citing Sixth Amendment to the federal constitution and <u>Davis v. Alaska</u>, 415 U.S. 308, 315-15 (1974) for the proposition that the United States Constitution guarantees the accused the right to confront witnesses and conduct cross-examination). <u>Id.</u> at 1-2.[11]

---

[11] Petitioner did not discuss <u>Davis v. Alaska</u> in his brief to the Minnesota Supreme Court or the Sixth Amendment right to confront and effectively cross-examine witnesses, except for this excerpt. Nonetheless, by referencing the Sixth Amendment

The Minnesota Supreme Court described the facts surrounding Petitioner's discovery claim as follows:

> Jackson first argues that he is entitled to a new trial because the State failed to provide him with complete discovery about witnesses once they were sworn to testify at trial. Jackson's argument relates to Minn. R.Crim. P. 9.01, subd. 3(2), which protects certain information about witnesses:
>
>> The information relative to the witnesses and persons described in Rules 9.01, subd. 1(1), (2) shall not be subject to disclosure if the prosecuting attorney files a written certificate with the trial court that to do so may endanger the integrity of a continuing investigation or subject such witnesses or persons or others to physical harm or coercion, provided, however, that non-disclosure under this rule shall not extend beyond the time the witnesses or persons are sworn to testify at the trial.
>
> Shortly after Jackson's indictment, the State filed a Rule 9.01, subd. 3(2), certificate to withhold information about 10 witnesses the State believed would be in physical

and the impairment to his ability to cross-exam witnesses in his direct appeal to the Minnesota Supreme Court, the Court concludes that he alerted the Minnesota Supreme Court to both prongs protected by the Sixth Amendment. As the Supreme Court stated in <u>Davis</u>:

> The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under <u>Pointer v. Texas</u>, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically. "Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination." <u>Douglas v. Alabama</u>, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965).

415 U.S. at 315. In <u>Pointer</u>, the Supreme Court held "the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment." 380 U.S. at 404.

danger if their identities were disclosed.   [FN 3] On January 9, 2007, the district court issued an amended order relating to the prosecutor's certificate. In that order, the court directed the State to redact all identifying information concerning the protected witnesses from the materials given to the defense.[12]

> FN3. Seven of those witnesses testified at the second trial. Of these seven, Dominique appears to have been the only one who did not also testify at the first trial. It is not clear whether the other six protected witnesses who testified at the second trial also testified at the first trial because the names of the witnesses who testified in the first trial are not part of the record. But given Jackson's argument, we assume that these six witnesses testified at both trials.

Approximately six weeks before Jackson's first trial, he moved the district court to compel discovery.  On June 27, 2007, and in response to Jackson's motion, the district court ordered the State to immediately disclose to defense counsel the names, dates of birth, addresses, and criminal histories of the witnesses whose identities had previously been protected. In addition, approximately two weeks before trial, the court ordered the State to disclose "which confidential witness corresponds to each witness identified by letter in the redacted discovery" that had previously been provided to defense counsel, and to "make all unredacted discovery available to defense counsel for inspection only within the prosecutors' offices."  Because the order also provided that Jackson could not learn about the substance of the testimony from these witnesses until they were sworn, the order stated that "[i]f defense counsel requires additional preparation in order to conduct an effective cross-examination of a confidential witness as a result of the late disclosure, defense counsel may request a recess from the Court."[13]

---

[12]    In this Order, the district court ordered that Petitioner's attorney was entitled to receive all information regarding the nine protected witnesses, including transcripts of audio and videotaped statements, but redacted to remove the identity and whereabouts of these individuals.  In addition, the court permitted Petitioner's attorney to show to Petitioner this information, but no copy was to be given to him.  See Docket No. 6-5 (Resp. Appx. Ex. C (Resp. MSSC Appx. (Order dated January 9, 2007)), pp. 1-2).

[13]    This Order governed 10 confidential witnesses.  See Docket No. 6-5 (Resp.

> Before his second trial, Jackson moved the district court to
> reconsider the June 27 discovery order.  On December 3,
> 2007, the court denied Jackson's motion because the court
> found that the safety concerns justifying the limits on
> access to unredacted documents still existed.[14]

<u>Jackson</u>, 770 N.W.2d at 477-78.

After acknowledging that Minn. R. Crim. P. 9.01, subd. 3(2) "does not specifically address the situation presented here, where witnesses are called to testify at a second trial, and where the district court has denied a motion requesting additional discovery before the start of the second trial," (<u>Jackson</u>, 770 N.W.2d at 479), the Minnesota Supreme Court held that even if it was determined that the State had violated Minn. R. Crim. P. 9.01, Petitioner would only be entitled to relief if he could show that he had suffered the kind of prejudice required for a new trial.  <u>Id.</u> at 479.  "Prejudice warrants a new trial only if a 'reasonable probability exists that the outcome of the trial would have

---

Appx. Ex. C (Resp. MSSC Appx. (Order dated June 27, 2007)), pp. 3-5).  In addition, on August 1, 2007, shortly before the first trial began, Petitioner filed a motion to reconsider the trial court's prior rulings on staggered discovery to defense counsel and the limitation on Petitioner's right to access to the information regarding the confidential informants in the case and based the motion in part on the Sixth Amendment.  <u>See</u> Resp. Appx. Ex. C (Resp. MSSC Appx. (Order dated August 1, 2007)), pp. 13-14).  The district court denied the request, stating again that "if additional time is needed to prepare because of any purported surprise, defense counsel may request a recess to prepare for any cross-examination." <u>Id.</u>, p. 14.  The court also noted that Petitioner "currently has the names of all but two of the confidential witnesses and can immediately assist his attorney to prepare cross-examination as to the individuals' motives to fabricate or to their biases based on personal relationships." <u>Id.</u>  The court affirmed its earlier order in which it had "found that there was a reasonable basis for the witnesses to fear their safety if their identities were disclosed in advance of trial." <u>Id.</u>

[14]    The trial court upheld its earlier rulings on Petitioner and his counsel's access to discovery.  <u>See</u> Docket No. 6-5 (Resp. Appx. Ex. C (Resp. MSSC Appx. (Order dated December 3, 2007)), pp. 21-23).  The court reasoned that the identity of the confidential witnesses and the substance of their testimony had been disclosed to Petitioner during the first trial, and neither Petitioner nor his attorney needed copies of the unredacted statements to present a defense as they had access to this information even if they did not have personal copies of the discovery documents. <u>Id.</u>, p. 23.

been different . . . '" Id. (quoting State v. Freeman, 531 N.W.2d 190, 198 (Minn.1995) (applying harmless error analysis)).

The court then examined the one piece of information for which Petitioner complained of prejudice – the State's failure to produce the unredacted statement by Dominique. Id. at 480.[15]

> Specifically, Jackson contends that he was prejudiced by the State's failure to produce the unredacted transcript of a police interview taken of Dominique, who testified for the State in Jackson's second trial. Dominique did not testify in Jackson's first trial. But at the second trial, Jackson twice attempted to use a transcript that his defense counsel had prepared, apparently from the audio tape of Dominique's police interview that counsel had been given. Jackson claims that these two difficulties in the use of this transcript caused prejudice that warrants a new trial.

> Jackson first points to difficulty in the cross-examination of Dominique. Jackson's counsel attempted to impeach Dominique by showing that, in the police interview, Dominique said that Jackson drove the vehicle, but in trial testimony Dominique said that Morris drove the vehicle. Dominique insisted that in the interview he had said that Morris was driving, and Dominique demeaned Jackson's counsel in front of the jury for what Dominique claimed was a mistake in the transcript counsel was using.

> Jackson also claims that he was prejudiced based on his attempt to use the transcript defense counsel created of Dominique's police interview when cross-examining Sergeant Zimmerman, who conducted the interview. Jackson's counsel used the transcript to suggest that Zimmerman had put the thought in Dominique's head that Jackson had a gun in the Explorer on the night of the shootings. Zimmerman, before answering Jackson's questions, commented, "I just have one concern, sir. I don't know where this [transcript] came from." [FN5]

---

[15]     The court rejected Petitioner's contention that he should have received unredacted information about all seven witnesses. Jackson, 770 N.W.2d at 480. The court apparently confined its analysis of prejudice to Dominique because in his appellant brief to the court, Petitioner only discussed the difficulties he had with the cross-examination of Dominique and Sergeant Zimmerman regarding Dominique's statement to Zimmerman. See Docket No. 6-5 (Resp. Appx. Ex. D (Appellant Brief)), pp. 33-36).

> FN5. Jackson moved for a mistrial after both
> instances in which he encountered problems
> with the transcript. The district court denied
> both motions, and Jackson does not challenge
> these rulings on appeal.

Id.[16]

The court concluded that Petitioner was not entitled to a new trial because he had not met his burden of establishing the requisite prejudice. Id. First, the court found that despite being given "the opportunity to call for a recess as witnesses were sworn to testify so that [Petitioner] could receive and review unredacted materials," he "made no request for a recess before or during Dominique's cross-examination or that of Zimmerman." Id. Second, even without an unredacted transcript, the court determined that Petitioner "was able to attack Dominique's credibility." Id. Third, based on the following facts, the court decided the evidence against Petitioner was strong:

> Morris, Dominique, and Xzavier all testified to the seating arrangement and that Jackson was the shooter at both locations. Forensic evidence suggested that the same gun fired at both locations. K.H., who knew Jackson, testified that she saw Jackson in the front passenger seat during the time between the shootings. M.K. and T.K., who witnessed the bus-stop shooting, testified that the shots were fired from the front passenger window of the Explorer. Finger print evidence confirmed that Jackson sat in the front passenger

---

[16]   In its response to the Minnesota Supreme Court, the State argued that Petitioner was not prejudiced regarding his cross-examination of Dominique and Sergeant Zimmerman because the portion of the transcript prepared by Petitioner's attorney and used during the cross-examination of Dominique had not been redacted; Petitioner's attorney had been provided with the unredacted tapes of the police interviews of Dominique; when Petitioner's attorney asked for an unredacted copy of Dominique's statement to use to cross-examine Dominique, the State indicated it had no objection to providing him with an unredacted copy of Dominque's statement for cross-examination, so long as he gave it back to her after the testimony; and instead of availing himself of the State's transcript, Petitioner's attorney used his own commissioned transcript of the statement during Dominique's cross rather than the State's transcript.   See Docket No. 6-5 (Resp. Appx. Ex. C (Respondent's Brief)), pp. 11-12) (citing to various transcripts from trial).

seat and that the alternative perpetrator suggested by the defense sat in the back seat.

Id. at 481.

Based on this analysis, the court rejected Petitioner's request for a new trial, holding "there is no reasonable probability that the outcome at trial would have been different if Jackson had been able to more completely impeach Dominique through use of an unredacted transcript of his police interview." Id. The court relied solely on state law and made no mention of Petitioner's Sixth Amendment argument in its decision. See Jackson, 770 N.W.2d at 477-81.

As described above, 28 U.S.C. § 2254(a) provides relief to state prisoners only for violation of the Constitution, laws or treaties of the United States. Therefore, this Court addresses only Petitioner's claim that the alleged discovery violation denied him his constitutional right to confront and cross examine witnesses against him under the Sixth Amendment to the United States Constitution.[17] The Court will not address

---

[17] In response to Ground One, Respondent framed the issue as a discovery violation under Brady v. Maryland, 373 U.S. 83 (1963). See Resp. Mem., p. 10. Respondent misapprehends Petitioner's claim. Petitioner did not assert a violation of due process for failure to disclose evidence "favorable to the accused . . . where the evidence is material either to guilt or to punishment . . . ." Brady, 373 U.S. at 87. Petitioner alleged that limitations placed by the trial court on his access to certain witness information violated his rights of confrontation and cross-examination under the Sixth Amendment. In any event, "the rule of Brady is limited only to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense . . . .[;] where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, Brady is not violated." Henderson v. Minnesota, No. Civ. 03-6507 (JRT/FLN), 2005 WL 5168551, at *17 (D.Minn. July 25, 2005) (quoting U.S. v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996) (emphasis in original)). Here, Petitioner's argument is not that the State withheld information or that information was unknown; rather his complaint was that his defense was hindered because both he and his attorney were unable to receive copies of the discovery for use at trial. Therefore, under Eighth Circuit precedent, there could be no Brady violation because all of the evidence was disclosed to the defense before the end of the trial. See e.g., Gray v. Houston, No. 4:07CV3099, 2008 WL 244225, at *2 (D.Neb. Jan. 28, 2008) (finding no Brady violation where information was disclosed during trial.)

Petitioner's state law claim that the State violated Minn. R. Crim. P. 9.01, subd. 3(2) by not disclosing information after witnesses were sworn during trial.

The Eighth Circuit described the contours of the right to cross-examination under the Sixth Amendment as follows:

> The Sixth Amendment "'guarantees an <u>opportunity</u> for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish.'" <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quoting <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam)). A defendant states a violation of the Confrontation Clause if he shows that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." <u>Id.</u> at 680, 106 S.Ct. at 1436; <u>see</u> <u>Layton v. South Dakota</u>, 918 F.2d 739, 741-42 (8th Cir.1990). If the information comes before the jury on cross-examination, although not in the form desired by the defense, it is unlikely we will find constitutional error. <u>See</u> <u>Layton</u>, 918 F.2d at 742; <u>United States v. Klauer</u>, 856 F.2d 1147, 1149 (8th Cir.1988).

<u>Harrington v. State of Iowa</u>, 109 F.3d 1275, 1277 (8th Cir. 1997) (emphasis in <u>Fensterer</u>).[18]

---

Further, in order to make out a <u>Brady</u> violation, Petitioner is required to establish that the withheld information was material to his guilt. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>U.S. v. Heppner</u>, 519 F.3d 744, 750 (8th Cir. 2008) (quoting <u>United States v. Almendares</u>, 397 F3d 653, 664 (8th Cir. 2005) (1995)). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (quoting <u>Strickland v. Washington</u>, quoting (<u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490, 466 U.S. 668, 694 (1984)). The Court finds that there was not a reasonable probability that the outcome of the trial would have been different if Petitioner or his counsel had actual physical possession of the State's transcript of Dominique's interview during the trial.

[18]     Unlike some constitutional claims, which by their nature require a showing of prejudice with respect to the trial as a whole, "the focus of the Confrontation Clause is on individual witnesses. Accordingly, the focus of the prejudice inquiry in determining

Based on these standards, Petitioner's Sixth Amendment claim fails. Petitioner was not denied the opportunity for cross-examination; he claims only that he was not given <u>copies</u> of certain discovery, particularly, a police interview with Dominique, to aid in his cross-examination at the second trial. Prior to trial, defense counsel, but not Petitioner himself, was provided certain information about the witnesses, including their identities and criminal histories, and was allowed to review, but not obtain, copies of unredacted discovery about their testimony two weeks before the first trial. <u>Jackson</u>, 770 N.W.2d at 478. Additionally, once the witness was sworn to testify at the trial, defense counsel was permitted to share the substance of the unredacted discovery with Petitioner, and defense counsel was allowed to request a recess from the court for additional time to receive and review the unredacted discovery for each witness as they were called to testify, to prepare for effective cross-examination. <u>Id</u>. Defense counsel did not make such a request in the trial. <u>Id.</u> at 480. Further, during the trial, instead of availing himself of the State's offer to use its transcripts of Dominique for cross-examination, defense counsel used transcripts he had prepared himself from the audio tape he had been given. <u>Id.</u> Most importantly, armed with the information he had been given and gleaned from the first trial, as the Minnesota Supreme Court concluded, Petitioner "was able to attack Dominique's credibility." <u>Id</u>.

Under these circumstances and applying the pre-AEDPA de novo standard of review, Petitioner's Sixth Amendment claim fails. <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S.

---

whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." <u>Van Arsdall</u>, 475 U.S. at 680 (internal citation omitted). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" <u>Id.</u> (quoting <u>Davis v. Alaska</u>, 415 U.S. at 318).

39, 53 n. 9 (1987) (plurality opinion) (confrontation clause only protects a defendant's trial rights, "and does not compel the pretrial production of information that might be useful in preparing for trial.")  On this basis, this Court recommends dismissal of Ground One.

## 2.    Jury Misconduct – Ground Five

Ground Five of the Petition states:  "Appealant (sic) was deprived of due process and fair trial when the trial judge violated appellant's 14th U.S.C.A. Const. Amends. when the judge made the decision not to grant Appellant's motion to dismiss the jury panel after they committed misconduct during trial."  Petition, p. 6.  In support of this contention, Petitioner argued to both the Minnesota Supreme Court and this Court that the jury was sequestered because of publicity surrounding the case, but several jurors testified that although they were in a room outside of the courtroom, they could hear everything going on in the courtroom.   See Docket No. 6-5 (Resp. Appx. Ex. D (Appellant's Pro Se Supp. Brief)), p. 7); Pet. Mem., p. 43.

The Minnesota Supreme Court made the following factual findings concerning this incident:

> Jackson argues that the district court erred by failing to ensure that, during voir dire, the panel of potential jurors remained sequestered.  One panelist reported that she and the others waiting outside the courtroom could hear voices coming from the courtroom.  The reporting panel member said, "I myself didn't hear everything clearly.  I could just hear voices.  Nothing very clear at all."  One of the other panel members was also questioned about what he heard, and he said that he heard what books a panelist ahead of him had read.  The first reporting panelist, as well as four others who waited in the same location, were sworn in to serve as jurors at trial. [footnote omitted].

The defense moved to "strike all the jurors who are present" on the ground that the parties operated under the assumption that the panel was sequestered and would have asked questions differently otherwise. Jackson essentially argues that the district court abused its discretion by failing to sequester prospective jurors, which resulted in exposing five sworn jurors to prejudicial material. The State responds that the decision to sequester the jury is within the court's discretion unless a juror is questioned about exposure to prejudicial material, Minn. R.Crim. P. 26.02, subd. 4(2)(a) & (b), and that no juror was exposed to prejudicial material here.

Jackson, 770 N.W.2d at 485-86.

Applying state law, which required the sequestering of "prospective jurors only if there is a 'significant possibility' that jurors will be exposed to prejudicial material that will make them 'ineligible to serve,'" the court then held that Petitioner had "not demonstrated, nor does the record support, that any juror was exposed to information that would compromise the juror's eligibility to serve" Id. at 486 (internal quotation and citations omitted).

"Whether voir dire results in an impartial jury is a question of fact entitled to the § 2254(d) presumption of correctness." Byrd v. Armontrout, 686 F.Supp. 743, 764 (E.D.Mo. 1988) (citing Patton v. Yount, 467 U.S. 1025, 1036-1038, 104 S.Ct. 2885, 2891-92, 81 L.Ed.2d 847 (1984); Sumner v. Mata, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); Simmons v. Lockhart, 814 F.2d 504, 511 (8th Cir. 1987), cert. denied, 485 U.S. 1015)); see also Thompson v. Keohane, 516 U.S. 99, 111 (1995) (listing questions that the Court has classified as "factual issues" within § 2254(d)). Petitioner did not challenge the factual findings of the Minnesota Supreme Court and this Court finds that it committed no error in its summary of the facts. See Byrd, 686 F.Supp. 743, 764 (E.D.Mo. 1988) ("Because there is fair support in the record for the Missouri Supreme Court's finding of fact that the voir dire did not result in an

impartial jury and because petitioner has not otherwise overcome the presumption of correctness which attaches to that factual determination, <u>see</u> 28 U.S.C. § 2254(d)(8) [pre-AEDPA statute], the trial court's denial of petitioner's request that aspects of voir dire regarding pretrial publicity be sequestered, individual voir dire did not deny petitioner his Sixth and Fourteenth Amendment rights to an impartial jury. 28 U.S.C. § 2254(d)").

As to Petitioner's due process challenge under the Fourteenth Amendment, the Minnesota Supreme Court did not address it. Accordingly, this Court reviews its legal conclusions de novo. <u>See</u> <u>Middleton</u>, 455 F.3d at 856 (where state court did not adjudicate constitutional claim on the merits, court reviewed district court's factual findings for clear error and conclusions of law de novo); <u>Taylor</u>, 329 F.3d at 967-68 ("Under the … AEDPA, we apply a deferential standard of review to state court resolutions of law and fact only if the state court adjudicated the prisoner's claim on its merits. 28 U.S.C. § 2254(d). Here, the state court did not adjudicate Taylor's claims on their merits and, therefore, section 2254(d) does not apply. We review the district court's findings of fact for clear error and its legal conclusions de novo.") (citations omitted).

The standard for review of a due process challenge is as follows:

> In a § 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow. (footnote omitted) The petitioner must show that the alleged improprieties were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." <u>Moore v. Wyrick</u>, 760 F.2d 884, 886 (8th Cir.1985); <u>see</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); <u>Donnelly v. DeChristoforo</u>, 416 U.S. at 642-43, 94 S.Ct. at 1871; <u>Smith v. Phillips</u>, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial--i.e., that absent the alleged impropriety the

43

> verdict probably would have been different. See Kirkpatrick
> v. Blackburn, 777 F.2d 272, 278-79 (5th Cir.1985); United
> States ex rel. Shaw v. De Robertis, 755 F.2d 1279, 1281 n. 1
> (7th Cir.1985).

Hamilton, 809 F.2d at 470.; Storey v. Roper, 603 F.3d 507, 517 and n.5 (8th Cir. 2010) (stating due process standard of review); Skillicorn v. Luebbers, 475 F.3d 965, 972 (8th Cir. 2007) cert. denied, 552 U.S. 923 (same).

Based on this standard, this Court concludes that Petitioner has not met his burden of establishing that had prospective jurors been sequestered and not overheard some of the questioning of other panel members, that the outcome of the trial would have been different.  Stated otherwise, hearing voices or questions about books a juror had read is not "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair."  Moore, 760 F.2d at 886; Stringer, 280 F.3d at 829 (quoting Moore, 760 F.2d at 886); Weaver v. Bowersox, 438 F.3d 832, 840 (8th Cir. 2006); cert. dismissed as improvidently granted, 550 U.S. 598 (2007); Clayton v. Roper, 515 F.3d 784, 792 (8th Cir. 2008) reh'g and reh'g en banc denied, and cert. denied, 129 S.Ct. 507 (2008).  Ground Five should be dismissed on its merits.

### 3.    Prosecutorial Misconduct Claim – Ground Six

Ground Six of the Petition, titled "Prosecutor Misconduct," states "the prosecutor violated the Appellant's 5th, 6th and 14th U.S.C.A. Const. Amend; when she committed prosecutorial misconduct by allowing coeresd (sic) testimony to go unchecked during trial.  Petition, p. 6.  This is the identical claim that Petitioner presented to the Minnesota Supreme Court in his pro se supplemental brief.  See Doc. No. 6-5 (Resp. Appx. Ex. D (Appellant's Pro Se Supp. Brief)), p. 8).  In support, Petitioner made the same argument to this Court and the state court:

During trial appellants (sic) counsel asked Officer Zimmerman whether he supplied the state with information, his reply was yes. The officer says to witness "we cant (sic) keep giving you information, you got to give us something." The officer testified to this during trial. See (t).p891.

Pet. Mem., p. 44; Appellant's Pro Se Supp. Brief, p. 8.

The Minnesota Supreme Court described Petitioner's claim as follows:

Jackson argues that the court erred when it allowed the State to introduce what he contends was the coerced testimony of Xzavier. Jackson's claim is based on the cross-examination of Sergeant Zimmerman. Attempting to impeach Xzavier's testimony at trial, Jackson questioned Zimmerman about tactics Zimmerman used in order to obtain information from Xzavier. Zimmerman testified that he questioned Xzavier by providing statements of fact that might be true or false and letting Xzavier respond according to whether Xzavier wanted to affirm or deny the fact.

Jackson, 770 N.W.2d at 486. Relying solely on state law, the court held that the State had not introduced coerced testimony because the "tactic [did] not create a deceitful or stress-inducing interrogation that would make the statements inadmissible." Id. (citing State v. Jones, 566 N.W.2d 317, 326 (Minn.1997)). The court did not address Petitioner's claim that the testimony violated the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

Respondent contended this Court is precluded from considering the issue of whether the state court erred by allowing the testimony of Xzavier Medlock (the alleged coerced testimony) because the Minnesota Supreme Court upheld the evidentiary ruling based on Minnesota case law. Resp. Mem., p. 29. Citing Murray v. Hvass, 269 F.3d 896, 898 (8th Cir. 2001), Respondent asserted a federal court cannot consider any issue that a state court has already resolved on an independent and adequate state

ground.  Id.[19]

The "independent and adequate state ground doctrine" applies when deciding whether federal district courts should address the claims of state prisoners in habeas corpus actions.  Coleman, 501 U.S. at 729.  The doctrine provides that a federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Id.  The rule applies whether the state law ground is substantive or procedural.  Id.  (citing examples Fox Film Corp. v. Muller, 296 U.S. 207, 210, 56 S.Ct. 183, 184, 80 L.Ed. 158 (1935); Herndon v. Georgia, 295 U.S. 441, 55 S.Ct. 794, 79 L.Ed. 1530 (1935)).  When the state law ground is substantive, the settled rule is that "where the judgment of a state court rests upon two grounds, one of which is federal and the other nonfederal in character, our jurisdiction fails if the nonfederal ground is independent of the federal ground and adequate to support the judgment.  Fox Film Corp., 296 U.S. at 210; Harris v. Reed, 489 U.S. 255, 260-61 (1989) ("Although this doctrine originated in the context of state court judgments for which the alternative state and federal grounds were both "substantive" in nature, the doctrine "has been applied routinely to state decisions forfeiting federal claims for violation of state procedural rules.") (internal citation omitted).

On the other hand, where a state court was presented with a federal constitutional challenge and the court decides the matter applying a substantive state law ground and does not even acknowledge the federal ground, the court examines the federal challenge and applies a de novo standard of review.  See e.g., Middleton,

---

[19]    Murray is distinguishable because it involved a state court finding of procedural default on an ineffective assistance of counsel claim and did not involve an independent and adequate state law substantive ground.

455 F.3d at 855-56 (where petitioner had specifically raised federal claim in his brief on direct appeal to the Missouri Supreme Court, "thereby fairly presenting and preserving the claim for federal review," and state court decided issue on state law "[w]ithout mentioning the Sixth Amendment issue or referencing any federal law," the Eighth Circuit "treat[ed] the issue as though it were adequately presented to the state court for review, but ignored" and applied the pre-AEDPA standard).

In this case, the Minnesota Supreme Court addressed Petitioner's prosecutorial misconduct claim only under state substantive law, although he fairly presented a federal constitutional claim in his pro se supplemental brief to the court. Therefore, this Court analyzes the merits of Petitioner's federal prosecutorial misconduct claim under the pre-AEDPA standard of review.

When a petitioner does not claim that the prosecutor's misconduct denied him the benefit of a specific provision of the Bill of Rights, such as the right to counsel or the privilege against self-incrimination, the court examines the claim by determining whether prosecutorial misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Donnelly v. Christoforo, 416 U.S. 637, 643 (1974). A claim that prosecutorial misconduct violated a petitioner's right to a fair trial under the Sixth Amendment is also analyzed under the due process standard. See Kerns v. Bowersox, No. 4:06cv1755 TCM, 2010 WL 1049841, at *9-10 (E.D. Mo. March 18, 2010) (analyzing petitioner's Fifth, Sixth and Fourteenth Amendment prosecutorial misconduct claims under fundamental fairness standard of Donnelly, supra).[20] "When a

---

[20] Further, when analyzing a prosecutorial misconduct claim and any related claim of trial court error in the admission of evidence, the claims merge into a single analysis under the applicable due process standard. Anderson v. Goeke, 44 F.3d 675, 678 n.2 (8th Cir. 1995).

habeas court is reviewing an allegation [of prosecutorial misconduct] '[t]he relevant question is whether the prosecutor['s misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" Darden v. Wainwright, 477 U.S. 168, 180, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly, 416 U.S. at 643); Barnett v. Roper, 541 F.3d 804, 812 (8th Cir. 2008), cert. denied, 130 S.Ct. 63 (2009) (same). A habeas petitioner must show "a reasonable probability that the outcome would have been different but for the [prosecutor's misconduct]." Kerns, 2010 WL 1049841, at *9 (quoting Barnett, 541 F.3d at 813 (quoting Weaver v. Bowersox, 438 F.3d 832, 840 (8th Cir. 2006)).

Applying these principles to the Petitioner's complaint of prosecutorial misconduct, and finding no error in the factual findings of the Minnesota Supreme Court, this Court concludes that the testimony obtained from Officer Zimmerman by the prosecutor did not amount to a due process violation or a violation of the Fifth or Six Amendments. Officer Zimmerman stated that he provided Xzavier with statements of fact for Xzavier to affirm or deny. No evidence was presented that Xzavier's testimony was not his own recollection of what happened, or that it was coerced. In fact, other witnesses corroborated that Xzavier was present during the shootings, and he presumably could testify as to what he witnessed.

What is more, even if Petitioner had established that Xzavier had been coerced to provide untrue testimony as Petitioner suggested in his argument to this Court and the Minnesota Supreme Court, he has not shown that the alleged error was so egregious, that it ultimately affected the outcome of his trial, or that without the testimony, the verdict probably would have been different. As the Minnesota Supreme Court found, the evidence against Petitioner was strong, even without the testimony of

Xzavier. There was witness testimony by Morris, Dominique and people who were not accomplices that Petitioner was the shooter, finger print evidence tying him to the crime, and video surveillance evidence. Petitioner has not met his burden of showing that by allowing Xzavier to testify as he did, the prosecutor rendered the trial so unfair as to deny Petitioner due process.

For all of these reasons, this Court recommends dismissal of Ground Six.

### C.    Certificate of Appealability

If the District Court ultimately adopts this Report and Recommendation, Petitioner must seek a Certificate of Appealability ("COA"), if he wishes to appeal to the Eighth Circuit Court of Appeals. See Fed. R. App. P. 22(b). Federal district courts cannot grant a COA unless the habeas petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also, Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997). A COA will not necessarily be granted simply because an appeal is pursued in good faith and raises a non-frivolous issue. Kramer v. Kemna, 21 F.3d 305, 307 (8th Cir. 1994) ("[g]ood faith and lack of frivolousness, without more, do not serve as sufficient bases for issuance of a certificate"). Instead, the prisoner must satisfy a higher standard; he must show that the issues to be raised on appeal are "debatable among reasonable jurists," that different courts "could resolve the issues differently," or that the issues otherwise "deserve further proceedings." Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir.), cert. denied, 513 U.S. 946 (1994) (citing Lozada v. Deeds, 498 U.S. 430, 432 (1991) (per curiam)). When a district court grants a COA, it is "inform[ing] the Court of Appeals that the petitioner presents a colorable issue worthy of an appeal." Kruger v. Erickson, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam). See also Slack v. McDaniel, 529 U.S. 473, 484 (2000) (granting a COA signifies that the

issues raised "'deserve encouragement to proceed further'")(quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893, n. 4 (1983) [reversed on other grounds]).  <u>Barefoot</u> summarizes the standard as follows:

> "In requiring a 'question of some substance', or a 'substantial showing of the denial of [a] federal right', obviously the petitioner need not show that he should prevail on the merits.  He has already failed in that endeavor.  Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.' "

463 U.S. at 893 (citations omitted).

Based on the record before this Court on Petitioner's Habeas Petition, none of the claims constitute a substantial showing of a denial of a federal right.  Therefore, this Court recommends that in the event the District Court adopts this Report and Recommendation, a COA should not issue.

## V.     RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

IT IS HEREBY RECOMMENDED that:

1.     Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Docket No. 1] be **DENIED;**

2.     This action be **DISMISSED WITH PREJUDICE;** and

3.     In the event the District Court adopts this Report and Recommendation, a Certificate of Appealability should not issue.


Dated:  January 18, 2011

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 1, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.